IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED

MAY 5 2006

JUDGE HARRY D. LEINENWEBER
U.S. DISTRICT COURT JUDGE

LOGAN KNITTING MILLS, INC., an
Illinois Corporation; and
MICHAEL S. FELDMAN,
Individually,

        Plaintiffs,

    v.

MATRIX GROUP LIMITED, INC., a
Florida Corporation,

        Defendant.

Case No. 04 C 7596

Hon. Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

The parties have filed Cross-Motions for Summary Judgment on their respective claims and Counterclaims relating to a contract that governed the sale of certain business assets by Plaintiffs Logan Knitting Mills, Inc. and Michael Feldman (hereinafter collectively, "Logan") to Defendant Matrix Group Limited, Inc. (hereinafter, "Matrix"). For the reasons set forth below, both motions are **denied**.

### I. FACTUAL BACKGROUND

Logan, an Illinois corporation, is in the business of manufacturing, distributing and selling coats, uniforms and other clothing; Michael Feldman is its sole shareholder. As part of its various clothing and apparel-related business activities, Logan operated a mail-order wrestling merchandise business called

Wrestlers Express, through which it sold uniforms, shoes and other sports equipment to U.S. high school and college amateur wrestling teams. Matrix, a Florida corporation, operates a mail-order business that sells equipment and apparel relating to various sports, including wrestling.

In approximately July 2004, Logan distributed a prospectus announcing the sale of its Wrestlers Express division and related assets. Matrix expressed interest in purchasing the business from Logan, and the parties commenced negotiations regarding the terms of the sale through their respective principals, Louis Orloff on behalf of Matrix, and Charles and Michael Feldman on behalf of Logan.

Following these negotiations, in September 2004, Matrix drafted an Agreement for Purchase and Sale of Assets (the "Contract"), and provided it to Logan for review. Over the course of the following month, the parties conducted further discussions regarding the final terms by email and telephone. On October 20, 2004, the parties held a telephone conference to finalize the Contract, during which Logan expressed objections to certain terms. The parties came to an agreement over the disputed terms, and Logan made handwritten revisions to the Contract reflecting the agreed-upon amended terms. Logan initialed the revisions, signed the Contract, and delivered it to Matrix for final review and signature. Upon receipt, Matrix also initialed the handwritten

revisions, signed it, and faxed it back to Logan on October 21, 2004.

Generally, the Contract required Logan to transfer its Wrestlers Express business assets to Matrix for a total purchase price of $362,000. Those assets included the Wrestler Express customer mailing list, internet address, telephone numbers, business records, physical inventory, and Logan's covenant not to compete.

Sometime in early October 2004, prior to the execution of the Contract, Matrix sent to Logan an initial payment of $182,000. At that time, Logan had already provided Matrix with its customer mailing list and certain business records as part of a due diligence process requested by Matrix. According to the Contract, the remaining sum of $180,000 was to be paid in separate installments, with a payment of $100,000 due on October 31, 2004, and another payment of $80,000 due on November 15, 2004.

Both Logan and Matrix now claim the other failed to perform as required under the Contract when the October 31 deadline arrived. Matrix asserts that Logan was required to deliver its physical inventory to Matrix before Matrix was required to make the $100,000 payment. Logan contends the opposite -- that Matrix was required to pay the $100,000 prior to shipping the inventory. After the October 31 deadline had passed, Logan sent several e-mails to Matrix asking for the $100,000 payment, but received no response

from Matrix until November 12, when Matrix responded by asserting that Logan had breached the Contract when it failed to ship the inventory. Logan subsequently filed claims for breach of contract and other relief on November 23, 2004, to which Matrix responded with its own counterclaim based on Logan's purported breaches. To date, Matrix has made no further payments toward the remaining $182,000, and Logan still maintains possession of the inventory. However, Matrix continues to use the assets that were previously transferred, including the Wrestlers Express customer mailing list, website, and phone number, to generate sales.

## II. **LEGAL STANDARD**

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is material if it could affect the outcome of the suit under the governing law, and a dispute is genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). While the Court considers all facts in the light most favorable to the non-moving party, to avoid summary judgment the non-moving party must submit competent and specific facts showing that there

is a genuine issue for trial. *Becker v. Tenenbaum-Hill Assoc., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990).

## III. DISCUSSION

Logan's Third Amended Complaint (the "Complaint") consists of five counts. Counts One and Two are breach of contract claims against Matrix based on the remaining $160,000 due under the Contract for the Wrestlers Express assets and $20,000 for Logan's covenant not to compete. Count III is a claim for unjust enrichment, wherein Logan seeks to recover the value of the assets transferred to and used by Matrix to generate sales up through the present. Counts IV and V assert reformation and alternative breach of contract claims based on Logan's contention that the parties reached a subsequent oral agreement that required Matrix to submit the $100,000 payment on October 31 before Logan would deliver the inventory.

Matrix's Counterclaim consists of a single count for breach of contract seeking the return of its initial $182,000 payment for the Wrestlers Express assets.

### A. The Parties' Purported Breaches

In its motion for summary judgment, Matrix contends that it cannot be liable for breach of contract as a matter of law because its performance was excused by Logan's preceding breaches. First, according to Matrix, the Contract terms unambiguously required Logan to deliver the physical inventory on October 31, 2004; thus,

Matrix's obligation to make the $100,000 payment was expressly conditioned upon delivery and acceptance of that inventory. Matrix emphasizes that Section 2.1 of the Contract specifically includes inventory as part of the "Assets" being purchased. In addition, the payment schedule set forth in Section 2.4 states that the $80,000 payment was due "upon delivery and acceptance of the Assets at the offices of the Buyer [Matrix] by October 31, 2004." Consequently, Matrix contends that the Contract, by its own terms, required Logan to deliver all Assets (including the physical inventory) on October 31, before Matrix was obligated to pay the $100,000 installment.

Matrix also asserts that Logan breached the Contract by failing to provide a customer mailing list exclusively owned by or licensed to Logan, as required under Section 3.11. According to Matrix, many of the names on the customer lists received from Logan were not exclusive because they consisted of names that were rented or purchased on a non-exclusive basis from the USA Wrestling Federation. Finally, Matrix claims that Logan failed to deliver the Wrestlers Express business and financial records to Matrix, which were also due on October 31.

Each of these breaches, according to Matrix, invokes the indemnification and hold harmless clause in Section 2.5, which bars Logan's from seeking recovery for damages. Under Matrix's interpretation of that clause, Logan agreed to waive any claims

against Matrix stemming from Logan's breach of any of the Contract terms.

Logan denies that it breached the Contract at all, insisting rather that the parties' performance and course of conduct prior and subsequent to the execution of the contract demonstrate that Matrix agreed to make the $100,000 payment on October 31 before Logan's delivery of the physical inventory. Logan also claims that Matrix has been generating sales from the Wrestlers Express assets that were transferred prior to October 31, including the phone lines, internet address, and mailing list. Accordingly, Logan argues that Matrix's continued use of those assets constitutes acceptance under the Uniform Commercial Code (the "UCC"), and, as such, Matrix is required to pay for the accepted assets.

With respect to the other purported breaches, Logan denies those claims as well. Logan contends that Matrix knew the Wrestlers Express customer list consisted of names that were obtained in part from the USA Wrestling list. Yet, Matrix did not object to the list prior to the execution of the Contract. Logan also asserts that it provided Matrix with all the records from its Wrestlers Express division in electronic format on disks that were provided to Matrix during the due diligence process. Matrix apparently did not object to the format in which the records were provided. The end result, under Logan's competing interpretation of the disputed terms, is that Logan fully performed its

obligations, and that Matrix breached the Contract by not paying the full contract price of $362,000.

## B. Interpretation of the Contract Terms

The starting point for the Court's analysis is whether a plain reading of the Contract indicates that Logan was required to ship the inventory on October 31 prior to Matrix's payment, or the reverse. Well-established law dictates that an unambiguous contract should be enforced strictly according to its terms. *Molex Inc. v. Wyler*, 365 F. Supp. 2d 901, 908 (N.D. Ill. 2005)(citing *Murphy v. Keystone Steel & Wire Co.*, 61 F.3d 560, 565 (7thc Cir. 1995)). Indeed, if the Contract could be characterized as such, there would be no reason to determine the parties' intent through extrinsic evidence, and Matrix's argument that its performance was excused due to Logan's anticipatory repudiation would carry substantial weight. *See Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1036-37 (7th Cir. 1998). Here, however, the Contract terms in dispute, at least on their face, fare no better in resolving the parties' conflicting interpretations of their obligations, leaving substantial factual issues that preclude summary judgment. *See id.* (noting that a contract is ambiguous if it is "reasonably or fairly susceptible to having more than meaning," or if what it says "it simply not clear on its face.")

Significantly, the Contract is unclear on the watershed issue of when Logan was supposed to deliver the inventory and when Matrix

was supposed to pay for it. In support of its position, Matrix points exclusively to handwritten changes in Section 2.4, which appear to contemplate an inventory delivery date of October 31, with payment contingent "upon delivery and acceptance of the Assets at the offices of the Buyer." (See Third Am. Cmpl., Exh. 1 ("Contract") § 2.4.) Read on its own, this term would appear to require Logan to ship the inventory first. However, under the definition of Assets in Section 2.1(a), inventory is specifically listed among other things to be delivered "as of the Closing." Article 7 sets forth the parties' obligations at the Closing, but does not specify the timing of the exchange. While that section does state that "[t]he transfer of the Assets to Buyer . . . shall occur at the place and time as specified in paragraph 2.5 above," that paragraph pertains solely to indemnification. (See id. Art. 7.)

Complicating maters further, Section 2.6, labeled "Closing," indicates that "[t]he closing of the transaction set forth in this Agreement shall take place at such date, time and location as may be mutually approved in writing by the parties." (Id. § 2.6.) Neither the Contract nor a separate writing identifies a particular date, and yet Matrix believed the parties were contemplating a mid-November closing date. (See Pl. LR 56.1 Statement, Ex. 2, Deposition of Louis Orloff at 176.) If nothing else, these inconsistencies give some credit to Logan's candid admission that

"hurried changes were being made by the parties without the assistance of lawyers the day before the agreement was signed. . . ." (Pl. Reply Br. at 6.)

Given that the Contract contains facial ambiguities, the Court is permitted to evaluate extrinsic evidence in search of the parties' intent. See Bourke, 159 F.3d at 1037. However, when examined in the light most favorable to Matrix (for purposes of Logan's motion for summary judgment) the evidence submitted by Logan does not conclusively resolve the issue in its favor either. Logan relies upon e-mails it sent to Matrix just before the October 31 deadline, repeatedly requesting that Matrix make the $100,000 payment before the inventory was shipped. Matrix did not object; indeed, Matrix did not respond until early November when it informed Logan that it considered Logan to be in breach and intended to terminate the Contract. (See Pl. LR 56.1 Statement, Ex. 20, 11/12/04 Email.) Under these circumstances, however, silence does not constitute assent, particularly because the Contract required any amendments to be made in writing. (See Contract § 9.2.) Thus there remains a genuine issue of fact as to whether the parties intended and agreed that Logan would deliver the inventory before Matrix was obligated to make any payments. This renders both parties' motions inappropriate for summary judgment, as they each attempt to excuse their subsequent performance lapses based on the events of October 31. See Diehl v.

*Twin Disc, Inc.*, 102 F.3d 301, 305 (7th Cir. 1996)("Summary judgment is not warranted when there are genuine issues of material fact with respect to the interpretation of a contract.").

With respect to Logan's other purported breaches, the express language in the Contract is likewise not dispositive. Matrix claims that Logan failed to deliver all the books and records, yet Logan insists that all the requisite information was provided in electronic format prior to October 31. Apparently, the Wrestlers Express business data was stored in a program called Mail Order Manager ("MOM"), which was accessible only with specific computer software that Matrix did not own. (*See* Pl. LR 56.1 Statement, Ex. 2, Orloff Dep. at 147.) The contract, however, does not speak to the format in which the data was to be provided. Consequently, there is also a genuine issue of fact as to whether the parties intended and agreed that Logan's delivery of the Wrestlers Express business records in electronic MOM format fulfilled its obligations under the Contract.

The same is true of the Wrestlers Express customer list. Matrix claims that the list qualifies as Intellectual Property under the Contract, and that it was not "exclusive," as defined in Section 3.11(e), because many of the names were purchased or rented from USA Wrestling. (*See* Contract § 3.11.) However, Matrix was aware prior to the execution of the Contract that part of the names on the Wrestlers Express list came from the USA Wresting list.

Indeed, Matrix had reviewed the Wrestlers Express list in September as part of the due diligence process to screen for duplicate names, and did not voice any objection to the list provided by Logan. (See Pl. LR 56.1 Statement, Ex. 2, Orloff Dep. at 69, 122.) Moreover, Matrix does not claim that it was restricted from marketing to customers on the list provided by Logan, notwithstanding that some of those individuals were taken from USA Wrestling list. To the contrary, it appears that Matrix continued to utilize the Wrestlers Express list in its marketing efforts even after the parties' relationship soured. In light of this background, it is unclear whether the parties' reference to exclusivity of ownership of intellectual property assumed that there would be some overlap between the two lists. Thus, the questions of whether the list was exclusive within the meaning of the Contract remains a factual issue appropriately determined by a jury.

Ultimately, for these reasons, the parties' remaining arguments in support of summary judgment must be rejected. See *Diehl*, 102 F.3d at 305. Matrix cannot rely on the indemnification clause as a bar to Logan's claims, at least at this stage, when disputed issues of fact exist as to whether Logan breached the Contract at all. Similarly, Logan's claim that it is entitled to payment for accepted assets (which is similar to its unjust enrichment claim) may be preempted by express contractual language

to the contrary, assuming Matrix can demonstrate at trial that Logan breached the Contract. In short, there remain significant disputed issues of fact precluding both parties' motions for summary judgment.

## IV. CONCLUSION

For the reasons stated herein, Logan's Motion for Summary Judgment is **denied**, and Matrix's Motion for Summary Judgment is **denied**.

**IT IS SO ORDERED.**

　                                          _____
　                                          Harry D. Leinenweber, Judge
　                                          United States District Court

Dated: May 5, 2006